U.S. DISTRICT COURT
WESTERN DISTRICT OF
PENNSYLVANIA_____

N.W.

        Plaintiff,

-against-

UNIVERSITY OF PITTSBURGH

        Defendant.

DOCKET NO. 2:20-cv-1964

 CIVIL

NOTICE OF MOTION

**Memorandum of Law in Support**

**REASON FOR TERMINATION FROM Ph.D. PROGRAM IS BASED UPON DECEPTIONS STEMMING FROM RETALIATIONS:**

1. The termination letter dated December 8, 2020 notes that "none of the mentors from three [lab] rotations during the first year concluded that you were qualified to conduct dissertation research in their programs." (Exhibit 1). This is false because I formally joined my 3rd rotation lab on August 14, 2020 with both the director of my department and my advisor/mentor signing off on my appointment and scholarship. (Exhibit 2). I actually joined two labs where one lab Principal Investigator was my co-mentor with no financial support.

2. The termination letter notes:

    "For the fall 2020 term, a committee of three qualified members of the graduate training faculty (Drs. Arjumand Ghazi, Michael Tsang and Donghun Shin) was appointed [the director of my department] to advise you in the choice of a fourth rotation. After communicating with them, you decided that your most important priority was to do computational research related to aging. Based on this, you chose to work on a provisional basis in the research group of Dr. Jianhua Xing. Although professor Xing appreciated your enthusiasm for research in aging, he concluded that you did not have the requisite background in mathematics, physics and computer programming that would enable you to master machine learning and other techniques at a level sufficient for research in the Xing research group."

3. I reached out to Dr. Xing to rotate in his lab days before meeting with my three advisors. I had reached out to Dr. Xing in Spring 2020 to rotate in his lab but he noted that funding was

1

limited. Dr. Xing agreed to allow me to rotate in his lab starting around October 16, 2020. Though I wanted to join Dr. Xing's lab, Dr. Xing suddenly changed his demeanor and interest without cause on my end which stems from the broader retaliation by the Graduate Office. Dr. Xing made taking machine learning a definite requirement near the end of the semester.

4. I informed my advisors on October 11, 2020 via email and I had Zoom meeting with Dr. Tsang and Dr. Shin at 1pm October 12, 2020. (Dr. Tsang noted that Dr. Ghazi is on leave). During the meeting Dr. Tsang noted repeatedly that I should find another lab for rotation in Spring 2021 that is a wet lab. He noted this after I informed him that I was planning on applying for F31 grant so that I could join Dr. Xing's lab which had limited funding. Dr. Tsang also noted that I should not be concern about picking a particular lab because I will get that opportunity later on in my career. It was on the latter part of the semester and really December 4, 2020 weekend when Dr. Ghazi noted that I need to definitely join a lab this semester.

5. Hence, I was misled about the timeline when I needed to definitely join a lab again. Furthermore, my new scholarship from the School of Medicine noted that "make appropriate progress in laboratory research" and did not explicitly note that I needed to join a lab Fall 2020. (see Exhibit 3). Additionally, the scholarship was for one year (September 1, 2020 to August 31, 2021).

6. I got a new scholarship after my advisor/mentor abandoned the scholarship and appointment that he signed (mentioned in paragraph 1 herein). This abandonment occurred after I initiated this lawsuit on August 26, 2020 when I was initially terminated (August 19, 2020) for not registering to retake a required course. That course and the bias grading of the course was also retaliatory. However, that was not the reason for the second termination.

7. Prior to the termination of December 8, 2020, I had emailed Dean Anantha Shekhar on November 24, 2020 about continued and ongoing retaliatory actions against me as well as widespread cheating reported in the course that I was retaking. He acknowledged my email on November 30, 2020 but did not reply to the content of email. On December 8, 2020, I got an email from Vice Dean Ann Thompson replying to the email requesting an investigation into allegations of bias and retaliation that I had sent to Dean Anantha Shekhar. Dr. Ann Thompson notes that the "Dean's Office does not conduct investigations of this sort…. If you

have academic concerns unrelated to allegations of retaliation and bias, please let me know and I can direct you to the appropriate handbook or policy to refer to." Dr. Ann Thompson also provided two links where I could file a report. I filed reports on December 8th and 9th.

8. On December 10, 2020, I received the termination letter via email from Dr. Horn (the director of my Ph.D program, Ph.D program Steering Committee, and Curriculum). The letter was dated December 8, 2020 which is the same date Dr. Ann Thompson respond to the email sent to the Dean as well as the same date I filed a report of retaliation and bias. I have reported retaliations associated with ongoing lawsuits via email to leaderships at the University from Fall 2019.

9. On December 11, 2020, Mrs. Laurel Gift, Assistant Vice Chancellor in the Office of Compliance, Investigations & Ethics emailed me noting that she had received all my reports on retaliation and bias. After I informed Mrs. Gift about the statements made by Dr. Ann Thompson, Mrs. Gift noted that she "respectfully disagree with Vice Dean Ann Thompson's interpretation of the faculty obligations under the academic integrity policy, which clearly includes reference to discrimination. Retaliation would also fit under the obligation to base academic evaluation based on good-faith professional judgement and not to base academic evaluation on other factors such as retaliation. It is imperative that you go through the academic integrity process so I would follow the procedures I sent to you this morning."

10. Mrs. Gift had sent me a link to the Academic Integrity Guideline.pdf so that I can go through academic integrity grievance process. This is the second concern that I have and does not fall under the Emergency Preliminary Injunctive Relief being sought. However, I have little to no faith in academic integrity grievance process which has Dean Anantha Shekhar at the head of the decentralized University system. I made reasonable requests to the Dean on November 24, 2020 but even then, he colluded with the effort to terminate me. Given the overall and coordinated retaliation against me since Fall 2019, I am asking the Court to intervene regarding these matters at a later date. At the point in time, the Emergency Preliminary Injunctive Relief is being sought to reinstate me into the Ph.D. since the appropriate offices to handle unlawful retaliation and bias in the University is willingly and/or forcibly unable to intervene.

**LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF:**

11. In the Commonwealth of Pennsylvania, the party seeking a Preliminary Injunctive Relief should show irreparable harm, greater harm if relief is not granted while insignificant harm to the other party, relief restores original standing before wrongful act, pleads a viable Complaint, the relief is fair and narrow, and the relief causes to adverse harm to public interest. The Federal law on Preliminary Injunctive Relief is similar.

12. The Plaintiff will suffer IRREPARABLE HARM if the Court does not grant the Preliminary Injunctive Relief. The Plaintiff worked for years during college and after college in the field of biomedical research. The Plaintiff graduated Magna Cum Laude in Biotechnology despite many challenges. The Plaintiff has completed one and half in the graduate program at the University and, in contrast to Defendant's attorney statement, formally joined not one but two research labs. The Plaintiff stated that those two labs abandoned the signed agreement in retaliation for initiating the lawsuit (see paragraph 1 herein). If the Plaintiff is denied continuation of his PhD training, the Plaintiff would have wasted all his investments coupled with the struggle of being a "super" minority in this field. See *The York Group, Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1242 (Pa. Super. 2007) (threat of continuing breach of contract and disruption of established business relations is irreparable harm); *Kessler v. Broder,* 851 A.2d 944, 951 (Pa. Super. 2004) (impending loss of business opportunity or market advantage can be irreparable harm); *B.P. Chem. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir. 2000) (injury to reputation of business can qualify as irreparable harm).

13. The Plaintiff faces greater harm of ending his PhD training if the injunctive relief is not granted. The Defendant does not suffer any significant harm in allowing me to resume my PhD training. See *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1283 (1992).

14. A Preliminary Injunctive Relief would allow the Plaintiff to resume his PhD training and join a lab of interest to instigate his dissertation work. See *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123, 1128-29 (1981); *Summit Towne Center, Inc., supra*, 828 A.2d at 1001.

15. The Plaintiff has provided sufficient factual allegations (and not evidences) in the Complaint for a viable cause of action under Title VI and Pennsylvania Human Relations Act. "We must "accept all the factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011) (alteration in original) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)." Moreover, the Court is also required to make inferences from the factual allegations at the prima facie stage. "The complaint need not contain "detailed factual allegations" but must set forth "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside)...." The Plaintiff explicitly stated a connection between his engagement in protected activated in Court and the retaliatory actions he was experiencing. From the factually allegations noted in the Complaint and the factual allegations noted above leading to his second termination, the Plaintiff has demonstrated his claims are not frivolous and has the potential to prevail with further due process. See *Summit Towne Center, supra,* 828 A.2d at 1001. Stated otherwise, the moving party "must show that it is likely to prevail on the merits". *Id.* (citing *Anglo-Am. Ins. Co. v. Molin,* 547 Pa. 504, 691 A.2d 929, 933-34 (1997)), and *Pelagatti v. Cohen*, 370 Pa. Super. 422, 536 A.2d 1337, 1343 (Pa. Super. 1987). Here are some quotes from the Complaint:
    a. "The plaintiff who is a Black male has been engaging in protected activity by filing claims such as a discrimination claim in other courts. The defendant has taken a number of adverse actions against the plaintiff including the ultimatum presented in the attached letter. The engagement in the protected activities is the primary source of the retaliatory actions: the distain and unreasonable grading by lecturers; harassments and defamations by staff and some students; and corrupted and conditional support by the leadership of the graduate program and the University."
    b. "The plaintiff has been harassed and/or defamed by some students, staff, and faculty since the influence by the military recruitment office and outside influences penetrated the University."
    c. "The plaintiff was coerced by the director to meet with a psychologist/psychiatrist after he disclosed that he was being intentionally graded harder and that he was being

5

      retaliated against due to ongoing lawsuits. The plaintiff also disclosed that he was facing other retaliatory actions on-campus because of the ongoing lawsuits. The plaintiff notified the Chancellor of the University and the Executive Director of the Graduate Office about the retaliation he was facing tied to ongoing lawsuits. But yet, the retaliations continued."

    d. "The director of the plaintiff graduate program also denied the plaintiff of opportunities to engage in activities because of the director's retaliatory actions."

16. Given that the Plaintiff did in fact join two labs after his normal three lab rotations but had the appointment and scholarship agreement subsequently abandoned by the Principal Investigators in retaliation, the Plaintiff has the potential of finding and joining a lab. Furthermore, the Plaintiff also stated clearly that he was misled by one of his advisors on the timeline to find a join a lab (see paragraph 4 and 5 herein). Given these and other stated facts, the injunctive relief is fair and only prevents this particular harm. See *John G. Bryant, Co. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164, 1167-71 (1977).

17. The Plaintiff's resumption of his PhD training presents no adverse impact on the public interest. See *Maritrans GP, supra*, 602 A.2d at 1283; *Philadelphia v. District Council 33, AFSCME,* 528 Pa. 355, 598 A.2d 256, 260-61 (1991).

18. The Plaintiff has shown irreparable harm, greater harm if relief is not granted while insignificant harm to the other party, relief restores original standing before wrongful act, pleads a viable Complaint, the relief is fair and narrow, and the relief causes to adverse harm to public interest. Hence, the laws of the Commonwealth of Pennsylvania and Federal laws demand the Plaintiff be granted at least Preliminary Injunctive Relief despise any conscious or subconscious preference.

Dated: Allegheny, Pennsylvania
December 17, 2020

                                         BY: N.W. , Pro Se
                                              /S/

                                       nw0354271@gmail.com

TO:

Mariah Passarelli
One Oxford Centre,
301 Grant Street 41st Floor
Pittsburgh, PA 15219
Email: **MPassarelli@cozen.com**

*Attorney for Defendant University of Pittsburgh*